The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning, Your Honors, and may it please the Court. The challenged regulations, which govern compensation for air ambulance services provided to members of West Virginia Medical Benefits and Workers' Compensation Plans, are consistent with how the State treats reimbursement for other medical services provided to its members, with the fee schedules that private insurers use, and with the approach that Congress itself follows in the Medicare fee schedules that are the basis for West Virginia's regime. By contrast, the Airline Deregulation Act reflects a decision to allow free market forces to substitute for federal and state regulation in the specific context of interstate passenger and cargo transportation. Nothing about the text of the ADA's preemption provision, or the purpose and structure of the statute as a whole, supports applying preemption to the area in which states have traditionally regulated, which are predominantly intrastate, and which involve third-party medical compensation decisions, which is the sector where the free market rationale for the ADA breaks down. How does the 2018 FAA Reorganization Act inform us about Congress's intent on preemption? Your Honor, it seems like they told us there is preemption. No, Your Honor. Respectfully, that's not what the Reauthorization Act did. Nothing in that act speaks to the particular authorization for air taxis and air ambulances. It also does not touch the preemption provision, even though Congress was acting in a time when there's significant litigation about this very question in courts nationwide. All it did, in fact, was provide... But you have to understand the purpose of the preemption provision was to make sure that there was only one level of regulation, rather than two, and to make sure that the Secretary of Transportation can regulate prices for air ambulances, and I think what Congress wanted to avoid was having two sets of price controls. One with the Secretary of Transportation, and another with every different state, because if you have two sets of price controls, then you're right back before the ADA legislation was even enacted. And it seems like that's why the preemption clause is in there, to avoid two sets of price controls. And it sort of seems that you're acting in the teeth of that preemption provision. That was just my first impression here. Yes, Your Honor, except that Congress in the ADA wanted there to be no price controls. It wanted neither the states or the federal government to regulate prices. The Secretary of Transportation is not understanding it. He has regulatory authority over air ambulances. Yes, over other provisions, and yes, that authority does extend to both air ambulances and airlines generally. But in the particular context of price controls, Congress said that even the federal government should not be setting price for interstate airlines. Yet Congress seemed to view that separately from compensation for medical services, because Congress... Is the preemption provision sales related to price? Yes, yes, Your Honor. Which is what the West Virginia statute seems to be related to price. No, Your Honor. The West Virginia statute's related to health care reimbursement. Not every request for a set amount of money is a price. Well, to give you that, on the fee setting thing, it seems to me that that's more market participant argument only comes into effect if this Court rejects the two independent textual arguments about authorization and the definition of a price. But even if the is acting like another market participant. Private insurers, for instance, have fee schedules. Congress has a fee schedule in Medicaid. The district court, it is true, focused on the balanced billing provision. Yet significantly, the district court did not enjoin that provision. It enjoined the fee schedules themselves, which puts West Virginia in a very difficult position, because it's unclear what rate, if any, West Virginia is required to pay. The district court emphasized... Let me ask this question, which I think is a little bit of Judge Floyd's point. So let me take first the PEIA. They may operate a little bit differently, and we'll get there. But 516.8A says that the combined total may not exceed the rate. And so that means that Arivac could go either to the employee or to the state, but whoever they go to, they can't get more than the rate. Is that right? Am I reading that correctly? Yes, John, that's correct. And similarly, in Section 2343, and this is with the workers' comp provision, I think it's A2, it similarly says the total charge, whoever you get it from, get it from the state, get it from the employee, doesn't matter, or third party, it cannot exceed the rate. That's the correct reading of that statute as well, right? Yes, Your Honor. And so the balance billing provisions really are sort of a separate story, because what that says is that means regardless of balance billing, put that aside, this sets a ceiling for how much Arivac can get from whomever, right? Your Honor, if it is operated under the particular strictures of those plans, and private insurers can do the same thing, they can say that if an air ambulance company or any other medical provider, for that instance, chooses to accept reimbursement under their plan, they also may not receive additional compensation from their employees. Correct, but here's what they can't do. What a private insurer can't do is say, yes, here's the amount we'll pay you. We'll pay you $500 on a $1,000 bill. What a private insurer can't do is say, if you want to forego getting reimbursement from us, and you want to instead proceed against the employee or the insurer, that we unilaterally cap how much money you can go get from the employee or insurer. That's what the, I mean, the unilateral choice of West Virginia to say, we're only going to pay $500, that's great. You can do that all day long. But what you've done, I don't mean you personally, but you get the benefit and the burden. What you've done instead is say, we unilaterally are only going to pay $500. But if you want to ignore us and just go against the person you provided service to, we're capping how much you can get from them too. And that's what a private insurer cannot do. That's the power of the state. This is the American trucking line. Now we're exercising the power of the state, right? Yes, Your Honor, I understand the concern. And again, a private insurer still has the ability to say that a condition of receiving reimbursement under their plan carries other costs to it. It carries costs, for instance, not receiving additional compensation from others. But even so, even if that's the concern, this court believes that the state of West Virginia stepped beyond what a private actor could do, the appropriate remedy would not have been to enjoin the fee schedules themselves. The district court's order went too far in that respect. No, but that's exactly the problem, right? You want to say it's about balance billing, but it's not. 516-8A and 2343-A2, those are the fee schedules. That's not the balance billing provisions, right? Those are separate balance billing. That's the actual fee structure provision. Am I misunderstanding? Is that what it says is no matter who you get it from, you cannot get a combined amount greater than the rate. Your Honor, that is 516-8AA, but the fee schedule for PIA is a separate statute, which the district court also enjoined. That's 516-5C1, which only gives authority to set the fee schedule. The district court enjoined that as well. None of the concerns that Your Honor referenced are evident in that provision as well. But in light of all this, how can you be a mere market participant? Because you have a club that most market participants don't have. And if you are, from the comments of Judge Floyd and Judge Richardson, if you are in fact setting fee schedules and establishing defaults level and preventing recovery of certain amounts, how is that just being a state coercion into the whole equation? Your Honor, all market participants in this health care reimbursement sector have some form of leverage they can give. They can offer the certain payment under a fee schedule in exchange for not collecting additional amounts from patients. But the point is, nothing about the district court decision prevents you from being a market participant in the future? Yes, it does, Your Honor, because the district court decision enjoined the statutes that allow both PIA and the Office of the Insurance Commission to set fee schedules. As I understand it, the way you would become a market participant is through your contractual leverage. And given the amount of public employees in West Virginia, you would have considerable bargaining leverage in any kind of contract. But Your Honor, the state's authority to set, to bargain, comes by statute. And what the court has said is because these statutes operate in the realm of air transportation, that none of these statutes are valid, even the pure fee schedule statutes. But Your Honor, I understand this court's concern with the market participant argument, but this court does not need to reach that because Air Evac is not a covered air carrier for purposes of the preemption act. The preemption statute is clear that states may not regulate the prices, routes, or services of an air carrier that, quote, may provide air transportation under this subpart, which is subpart two of the ADA. Subpart two explains what that means. Section 411.01 says that an air carrier may provide air transportation in the same language from the preemption provision, only if it is certified under that chapter, and then lists certain certifications. Yeah, but I didn't think the language under this subpart was tied to the certification requirement. Yes, Your Honor, it is. Because subpart two... No, because the subpart is much broader than the certification requirement because the Secretary of Transportation can exempt an air carrier from the certification requirement. And yet under the language of this preemption provision, you would still be subject to the other provisions of the subpart. I mean, the other provisions, I guess, are the record keeping and the... Anti-discrimination, yes. So the interesting thing is that the language of subpart is broader and not tied to a certificate. Certainly, Your Honor, there are additional requirements under subpart two. The language of the preemption provision says, may provide under this subpart. And as the Supreme Court said in the Ardesti decision, under means by reason or authority of. And there's nothing in subpart two that gives air evac... Nobody provided air carriers, air ambulances, provide transportation under the sub... They're not authorized under the subpart to provide transportation. Air evac looks to the neighboring subparts three and subpart one. Air evac does have a subpart three safety certificate. But all airlines, all air carriers have that. That's separate from the economic authorization subpart two. But isn't the exemption under part 298? Yes, yes. Part 298 is not the statute. That's the regulatory code itself. But the fact that they're exempted under the part 298, the fact that they're No, Your Honor, because the exemption authority comes from subpart one of the statute. So if we're looking for the source of the authority to operate... But they're exempting them from subpart two. Yes, but nothing in subpart two gives them that authorization. Congress specifically looked at this argument of whether the preemption provision should include certificates and exemptions or just certificates. The Senate language would have applied to both. It would have said that preemption applies both to certificated and exempted air carriers. What you're arguing is that the secretary can exempt carriers from preemption by exempting carriers from the certification process. And that doesn't seem to me to be the way that the statute reads. That would be a chaotic reading of it because it would allow the secretary to unwind the whole act through an exemption from certification. And the secretary grants exemptions from certification on a fairly regular basis because certifications are burdensome to acquire. But the exemption from the preemption... Well, Your Honor, the exemption provision is limited to when there's a public interest need. And the burdensome requirements you mentioned are very reasonable and it makes sense that this regime Congress set in place. It makes sense to say that Congress would have said traditional interstate passenger and cargo airlines undergo extensive Federal certification processes and States should not undo those exemption, they haven't gone through that Federal certification process. And so the rationale of avoiding overlapping and conflicting regulations doesn't apply in the exemption process. Now, on top of all of this, I think you understand some of the questions that the three of us have posed to you. But aren't you trying to gin up a circuit conflict? With the 10th and 11th circuits, look at those 10th and 11th circuit decisions. And if I may put it gently, they did not seem favorable to your argument. Your Honor, technically there would be a circuit conflict, but the reality is the majority of courts to look at this issue, they didn't look at the authorization issue specifically. The issue was conceded or was not litigated. That was true of the 11th circuit's decision in Bailey. That was true of the 10th circuit. You want us to just flatly disagree with the 10th and 11th? No, Your Honor. I want this court to engage with these textual arguments that were not raised to those courts in any other context. But what precisely, and I know your time's up, but tell me again precisely what argument you think you're making that wasn't made there? Yes, Your Honor. The argument about the source of authorization, what it means to provide air transportation under this subpart, was not raised in the 11th circuit's Bailey decision. It was not raised in the 10th circuit decision. In other words, are they a covered air carrier? Exactly. Are they covered? And the 10th circuit's decision, if I may briefly, found that the purpose of the ADA was definitely at odds with the reading that Air Evac is arguing here, but emphasized it had no textual basis to rule otherwise. This court has that textual basis and should rule otherwise. Thank you, Your Honor. Excuse me. I don't want to get you off pace, but I'm going to do that anyway. Can you just answer the question that I asked her? What is the proper piece, under your view of the case, that should be enjoined? It looks like the court, in its order, found preempted 516-AA and 516-5C, as well as 24-43. It found all of those to be preempted. That's correct, Your Honor. And at the risk of danger for you, is that correct? Is that your view, or is that the right sections to be preempted? Absolutely, Your Honor. And the regulations that flow from them that actually set the schedules. And the reason for that is twofold. One is that we pled pleading in the alternative, as opposed to the actual balance billing provisions, because we don't want the patients to be in the middle. And specifically for workers' comp, if you actually eliminated the balance billing provision, it would turn the entire workers' comp structure on its head, and it would take away the tort liability that the employer is protected from, and all of a sudden put the employee in a position where they may have an ability to sue the employer. And so going with the descheduled piece does the least harm to the overall purpose of the act. Now the state of West Virginia has full ability to change that. As long as they want to create law that isn't preempted, they can decide we would like for you to balance bill. But under this order, the judge did the right thing. And is that, in essence, if we were really trying to dig down on that and we may not be here, is that really a severability question under West Virginia state law? It's absolutely a severability question. And if you take the Cox opinion out of the Tenth Circuit, that went back down to the state courts in Wyoming. In the Wyoming lower court level, they decided that they were applying the preemption provision the way that the court said. They said that we receive our full bill charged. The state of Wyoming then appealed it to the Wyoming Supreme Court, and it's sitting in the Wyoming Supreme Court right now. The arguments were about a month ago, and that is the severability analysis that your Honor is talking about. Thank you. I think if you agree that state health insurance plans and workers' compensation schemes are fields of traditional state regulation. Yes, just like consumer protection was in Morales. And if that's true, haven't we long presumed that Congress does not mean for a federal law to preempt a state law in the traditional field of state regulation, unless there is a clear and manifest purpose stated by Congress? So that is true, Your Honor. And we believe that the express preemption provision under the Puerto Rico decision from the United States Supreme Court and under the trilogy of cases from the United States Supreme Court shows that Congress had an express purpose here, and the presumption doesn't apply. Morales, the argument was made. The presumption should apply. The court ignored that argument. Wolins, the argument was made. The presumption should apply. The court ignored that argument. Ginsberg, the argument was made. The presumption should apply. But if we chose to follow a presumption, follow the presumption, that would not put us at odds with the Tenth Circuit case, would it? Yes, the Tenth Circuit case said that they were not applying a presumption against a preemption, so technically it would put you at odds. Even if you applied a presumption against a preemption here, the preemption would still apply. The express purpose of Congress is clear that air carriers should not be regulated by the states related to price, route, or service, and that's exactly what the state of West Virginia is doing. And every court that's looked at this issue, and Your Honor pointed out two of them with fee schedules, but there's also a whole host of other ones, including the PHI Court in the Third Court of Appeals in Texas, the Sullivan Court out of the Western District of Texas, the Dwell case in North Dakota, and the Eagle Med case in the Kansas Court of Appeals have all dealt with. One of the things that you pointed out is of interest to me. During the court, in the course of amending the statute, the general thrust of those amendments were to give the Secretary of Transportation additional authority to look into the statute of practices on the part of the air ambulance industry. But they did. They looked at this in a relatively comprehensive way. They decided to augment the powers of the Secretary of Transportation to investigate abusive practices in this industry. But at the same time, they recognized the danger of too many chefs in the kitchen and multiple layers of regulation with regard to price and route. They left that preemption provision, as I understand it, completely untouched. And when you regulate things around it, and the thrust of... I mean, when you amend things around it, the thrust of those amendments is to address the problem that plenty is concerned about, which is maybe abusive pricing or abusive practicing or deceptive advertising or whatever in the air ambulance industry. Even given the recognition that this may not be an industry without problems, it needs to be addressed, that preemption provision was left pristine. That's correct. It was not touched. That's correct. There's got to be some significance to that. It seems to me that this basic thrust of the whole legislation was not to have layer upon layer upon layer of regulation because it has all kinds of counterproductive effects. You can unwind a statute very quickly by holding the secretary by bringing an exemption from a certificate of public convenience, thereby pull somebody out of the preemption provision. That creates all kinds of chaos because the secretary of transportation grants these exemptions on a fairly routine basis, and if it's thereby pulling someone out from the preemption provision, it's going to create a chaotic situation in terms of the way this entire statute operates. We absolutely agree, Your Honor. When you look at the 2018 amendment to the FAA Reauthorization Act, the Reauthorization Act, it... There's an old chestnut in judging. The old chestnut says, Do no harm. Do no harm. And there's harm around the bend and there's harm around the corner, and we can't foresee all the consequences, but something tells me with the wrong decision in creating what I think would be a circuit conflict, in the course of creating a circuit conflict, we'd also be creating a mess. Your Honor, that harm point is a really good one in that Part 298 certificate holders include commuter air carriers, which are passengers, planes that hold 60 passengers or less, and in the holding 60 passengers or less, there's 79 air carriers that are registered as commuter air carriers under Part 298, so they don't have a 411 certificate. They receive preemption. That includes United Express moving from Texas to Louisiana or Texas to Oklahoma. That includes a number of air carriers you've heard. It also includes Part 294 certificate holders, which are Canadian air operators that are coming into the United States. There's just shy of 300 of those. Those would no longer receive preemption. We'd have states like Wyoming regulating and dealing with diplomatic issues that literally Section 2, Subpart 2, deals with, so I think your harm point's a really good one. But dealing with the 2018 Reauthorization Act, Section 418 of that literally creates for the Secretary of Transportation an advisory committee on how to deal with some of the issues that are coming up in this industry. It includes the Secretary of Health and Human Services, so it includes the medical side. It includes states. All of that is supposed to culminate in a report that the Secretary of Transportation gives to Congress, and that report is in Section 420 and the contents of it, and I think that the contents of that report is the most instructive thing about what Congress thought about the preemption provision, and Judge Floyd, this goes to your question that you asked right from the very beginning. The contents of the report that the Secretary of Transportation is supposed to give to Congress, a timeline for the issuance of any guidance concerning unfair and deceptive trade practices among air ambulance providers, key language, including guidance for the state and political subdivisions of the state, same language that's in the preemption provision, to refer such matters to the Secretary, which means deceptive practices, unfair practices, pricing issues, the state is supposed to refer those to the Secretary, and the Secretary is supposed to work with the states to figure out the right way to do that. That is this month, came out this month, and I think shows what Congress thinks about the preemption provision. So it's cooperative. The model there is one of cooperative federalism rather than dual regulation. That's correct, Your Honor. I mean, those are basic statutory models, and it's pretty clear which road in the wood that these amendments and this statute overall is taking. We agree, Your Honor. Now, if there's any doubt about what under this subpart means, I first point the Court to the Adestani case that counsel cited. If you read that case, we're talking about an Administrative Procedures Act and whether or not a specific proceeding happened under that act, meaning subject to regulation under that act. The Court said no. Here, there are at least seven or eight provisions in subpart two that I can name out that were subject to regulation. Part 298, certificate holders are subject to regulation. Those have been augmented and amended, all subpart two pieces of the legislation in 2018. But more importantly, and I think this is probably what kind of puts the linchpin in our argument, that is, there was no such thing as subpart one, two, three, or four prior to 1994. So in 1978, when the preemption provision came out, it was all related to Title IV. The danger here is equating an exemption from the certificate of public convenience and necessity with an exemption altogether from the subpart. Those are just two very different things. And what creates the mess is to try and equate them. That's correct, Your Honor. We completely agree with that. Can I transition a little bit just to ask what may be a simple question? Under your view, could a state like West Virginia adopt a law that sets the rates for air ambulances, whether directly or by delegation to an agency to set the actual rate? But they set the rate that, for example, the PEIA will reimburse for air ambulance services, but does nothing with respect to third-party reimbursement or employee reimbursement. It literally just says the PEIA will pay only $500 a trip, whatever the number is. Could they pass that under this provision? Yes, Your Honor, they could. Without stating the obvious, tell me why. Well, that would put us basically in a market participant kind of context, right? We would literally be able to get what the plan says we're permitted to get, and then we could go to the consumer for the rest. I'm not trying to cut you off. So now tell me why, as a matter of separability, we ought not to leave the rate schedule alone and strike down these other provisions that enforce it as a cap. The provisions that I began with, 516.8a and whatever, 23.34a2. Why the rate schedule goes down? If we think they could pass this, why, as a matter of separability, do we do both the sort of enforcement of the rate schedule on third parties and also the rate schedule? Why not leave the rate schedule alone? So, first of all, I think the separability question is one for the states to deal with themselves, and I think the Cox opinion made that very clear. Secondly, as the mechanism for doing that, because the district court here has made that separability decision, right? So how does the state deal with it? So I don't believe the district court has made the separability decision as far as how to apply the law with the actual struck language that is preempted out, then determining how to apply the law at that point. I think it's separability. But the district court enjoined the provision that permitted the creation of the schedule. Right. Right? So not its enforcement anywhere, but just the creation of the schedule, right? I mean, this is like creating a committee report or anything else, right? They enjoined the creation of this schedule, right? So it's not left up to the states. This district court decided, I'm going to strike down the schedule. Assume that we're with you on the idea that that schedule providing a ceiling is problematic under the market participant exception. If the schedule merely says PEIA, that's all PEIA is going to pay. Where you get it from somewhere else, there's no balance billing, there's no ceiling, none of that applies anymore because that's preempted. But what I'm having trouble understanding is why does the rate schedule itself also fall? So we pled in the alternative. We pled the rate schedules to be preempted, and that was what we asked the court to do, and that's what the court found. And I think at the end of his order, he said, I'm not addressing the balance billing prohibitions because – But he did two different things, right? So he struck down the balance – forget about balance billing. He struck down the schedule, but he also struck down the enforcement of that schedule, right? Section 516.8a, subsection a, enforces that schedule. It says the total amount that your client gets cannot exceed the schedule in essence, right? I'm simplifying a little bit, right? Same thing with 23.34a.2, right? You can't get more than the schedule. So take those provisions away, which the court did strike down. Yes. You're then left with a schedule that is enforceable on no one except for PEIA. That would be correct, but that would put the patient right in the middle. That's totally true, but for us, the question, it seems like to me, is under West Virginia law, is that the appropriate severability analysis? Do we determine that West Virginia, this sort of abstract question we ask about severability, like would West Virginia prefer no rate schedule or a rate schedule that only applied to its own entity, PEIA? Isn't that the severability question? That is the severability question. Why not leave the schedule alone and strike down the mandatory application? So I don't think that Judge Johnson actually put a pin to 516.8a. No, he definitely did. He took out just that piece and the rate schedule, or did he take out every, because that 516.8a. The court finds the ADA preempts 516.8a. It then also finds the ADA preempts 516.5, which is the make up the schedule, and 23.43. As a whole. As a whole. Yes. And that's what we ask him to do. And then they can attempt to apply the law without those provisions, and they can make a decision where PEIA fits within that. Do you people have any objection to an opinion indicating that it remains open, that we're not trying to foreclose West Virginia's ability to act as a market participant through the PEIA Act? Absolutely not. In other words, I mean, I think an opinion can make it clear that we're not foreclosing, the preemption does not foreclose West Virginia's ability to act as a market participant through whatever bargaining power on the line of PEIA. That's correct, Your Honor. So we're certainly not saying that. Now, the Judge Richardson's question, I think the question gets a little more complicated with workers' compensation. No, that's why I've tried to stay away from that one. It gets much more complicated for workers' compensation. But we're certainly not saying that if they wanted to come to the table and they want to say under their PEIA plan, which is just like an insurance plan, that they're going to pay X and then we can go to the employee, that's the state of West Virginia's choice to do that. We would hope that they wouldn't. There's lots of insurers that do not do that. There's some insurers that do do that. But an opinion can make that very explicit. Yes, but we believe it's the state's decision to make that very explicit. That's what I'm saying, that we're not foreclosing the state's decision in that regard. The state pertains to options. Absolutely, and we completely agree with that. I do want to address just for one more minute the under-the-sub part argument for one last minute. Council mentioned the Senate version of the bill in 1978. The actual version that went up was the House version. Literally just before it was passed, the committee that actually drafted the language was asked the question, do commuter air carriers, Part 298 certificate holders, do they receive preemption under the exact language that we're talking about now? And the answer was yes. This whole idea of Subpart 1 through 4, I started to go down this path, and I just want to make sure and get it out. It didn't exist prior to 1994. And in 1994, when they changed from Subpart 1, 2, 3, and 4, Congress specifically said it was simply a clerical change. Wollins, the United States Supreme Court, recognized it was a clerical change. No substantive change was intended to be made. The entire idea of where your certificate comes from, they would have no ability to make that argument pre-1994, and nothing was intended to change in 1994 when the Subpart 1, 2, 3, and 4 was created. Briefly addressing price, every court that's ever looked at this says this on its face fits the definition of what Morales gives us on price. I see that my time is up. I'm going to check in. Hi, Sue. Your Honors, to begin with the severability point, at minimum this court must reverse the district court's opinion to the extent that it struck the fee schedules themselves, as well as the statutes that authorize PIA and OIC to set fee schedules that call company regulations. I know you're making it now, but do you really make that argument in your brief? Yes, Your Honor. In our briefs we argue that the ability to set fee schedules, that is a core component of a market participant, and anything that the district court may have thought overstepped what any other, what a private participant in the market can do, that we recognize in our brief, that is the part at most that should be held preempted. But anything that goes to the ability... is sort of implicit in the argument that you actually made. No, Your Honor. We expressly made the argument that balance billing provisions or the provisions that require air ambulances not to go after any other parties for any amount above the fee schedules, that that is the most that should be enjoined. We argue that in the district court. We cite the provisions in our reply brief where we made that argument. This is not a new argument we're making now. At minimum that portion of the district court's order must be struck. But Your Honor, it should strike the entire order. This, and this would not cause any of the chaos that this court seemed to be concerned about. Congress was predominantly concerned in the ADA about overlapping regulation in a predominantly interstate market where certain airlines also serve particular cities within the same state. That's flipped on its head here for air ambulances and air taxis where they operate predominantly within a state with only incidental interstate service. And there are other doctrines that police states' abilities there. States are not allowed to regulate in areas that would affect and hinder interstate or foreign commerce. So none of those concerns would apply with the broad preemption reading here. Particularly in an area where Congress itself did not believe that medical reimbursement was the same as rate setting. Congress has had a Medicare fee schedule that includes rates for air ambulance services. The same Congress that said that there should be no federal or state regulation for the rates of a traditional air carrier seemed to find no inconsistency with those fee schedules. That's exactly what's happening here. The chaos would be to allow the district court's decision to stand which currently says that Congress and private insurers can enforce fee schedules but states uniquely cannot. That's the absurd and chaotic result that this court should avoid with a careful text-based reading of the preemption provision. The preemption provision says it only applies to air carriers who may provide air transportation under subpart 2. The other regulations in subpart 2 that opposing counsel refers do not speak to the authorization to provide services. They speak to how air carriers may operate but not whether they may operate that way in the first place. Nothing in subpart 2 does that. Can I stop you for a second and just back up? I want to go back to whether you actually raised this issue. I look at what I believe is page 36 and page 37 where you make the argument that the balanced billing provisions should be struck instead of the other challenged provisions. The provisions I've talked about, 23.4 and 516.8a, those are balanced billing provisions. Those are actually the other provisions that you're referring to. If I'm not at 36 and 37, help me understand where the argument was made that this court should engage in this sort of severability analysis leaving 516.5 alone but getting rid of these other provisions, putting the balanced billing provisions aside. None of those are relevant at this point. Yes, John, I think I understand the confusion there. There is a certain balanced billing provision that's tailored only to that issue. That's in 1629.d.4. But there are also balanced billing aspects of the enjoined provision in 516.8a.a. In our brief, we spoke about balanced billing provisions generally. In the district court pleadings where we raised this argument as well, which again are cited in our reply brief, we talked about particular components of balanced billing, not only in the context of 1629.d.4. Thank you, guys. Thank you. We'll come down and bring counsel later into our final case.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Julius N. Richardson